**Edward DERRIG, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security,[1] Defendant.**

No. C 93–3079.

United States District Court, N.D. Iowa, Central Division.

Sept. 29, 1995.

---

1. The function of the Secretary of Health and      Human Services in social security cases has been

transferred to the Commissioner of Social Security effective March 31, 1995, pursuant to § 6 of the Social Security Independence and Program Improvements Act of 1994. In accordance with this section, the court has substituted Shirley S. Chater, Commissioner of Social Security, for Donna E. Shalala, Secretary of Health and Human Services, as defendant in this case.

Danny Wilmoth of Legal Services Corporation of Iowa, Des Moines, Iowa, for Plaintiff Edward Derrig.

Lawrence Kudej of United States Attorney's Office, Northern District of Iowa, Cedar Rapids, Iowa, for Defendant Shirley S. Chater, Commissioner of Social Security.

## ORDER REGARDING SECRETARY'S DENIAL OF SOCIAL SECURITY DISABILITY BENEFITS

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ....................................................589
   A. Procedural Background ...............................................589
   B. Factual Background .................................................589
   C. The Court's Jurisdictional Basis .......................................594

II. ANALYSIS .......................................................595
   A. The "Substantial Evidence" Standard....................................595
   B. The Polaski Standard and Subjective Pain Credibility Determinations.....596
   C. Relative Burdens of Proof............................................597
   D. Review of the ALJ's Decision ........................................597
     1. Derrig's disability insured status .................................597
     2. The ALJ's analysis of Derrig's subjective pain complaints .............598
       a. Derrig's prior application for benefits ...........................598
       b. Inconsistencies regarding Derrig's physical impairments ..........598
       c. Evidence regarding Derrig's mental impairments .................600
       d. Inconsistencies regarding Derrig's daily and work-related activities .........................................................601
     3. S.S.R. 85–15 and the hypothetical questions ........................602
     4. Disability under POMS ..........................................603

III. CONCLUSION ....................................................604

This social security disability case requires the court to analyze the employment capabilities of an individual who has both physical and mental impairments that the Secretary has previously deemed insufficient to qualify him for benefits on two prior occasions. Although the plaintiff did not appeal the administrative law judge's (ALJ's) initial decision, he did appeal the ALJ's second denial of benefits. The issue before the court is whether the final decision of the Secretary is supported by substantial evidence on the record as a whole. Specifically, the plaintiff alleges he has both physical and mental impairments which preclude him from performing his past relevant work or any other work that exists in significant numbers in the national economy. On the other hand, defendant argues the plaintiff has not met his burden of showing he cannot return to his past relevant work. Consequently, the court is presented with the arduous task of examining the voluminous record which chronicles the plaintiff's physical and mental history

compiled both before and after the initial decision denying the plaintiff benefits and ultimately discovering if the ALJ's decision to deny this plaintiff social security disability benefits was, in fact, a decision supported by substantial evidence.

## I. INTRODUCTION

### A. Procedural Background

Derrig filed an application for social security disability benefits under Title II on November 27, 1990, (Tr. 217.), alleging he became disabled on March 1, 1989.[2] (Tr. 217.). His application was denied initially on March 5, 1991, (Tr. 230.), and after reconsideration on May 7, 1991. (Tr. 247.). An administrative hearing was held concerning this matter on April 26, 1993, after which the ALJ determined Derrig was not disabled and not entitled to social security disability benefits on May 27, 1993. (Tr. 18.). On August 12, 1993, Derrig requested review of the ALJ's decision from the Social Security Administration Appeals Council. (Tr. 11.). On October 15, 1993, the Appeals Council denied Derrig's request and stated that "the [ALJ]'s decision stands as the final decision of the Secretary in your case." (Tr. 8–9.). Because the Appeals Council's October 15, 1993 letter denying Derrig's request represented the final determination of the Secretary, and because Derrig filed this action on December 10, 1993, there is no dispute that Derrig's complaint was timely filed with this court. Therefore, Derrig is entitled to a review of his case under 42 U.S.C. § 405(g). The court will now begin its analysis of the Secretary's decision by examining the factual background of the case.

### B. Factual Background

The plaintiff in this case is Edward Derrig, a 39-year-old man from Fort Dodge, Iowa, (Tr. 65.), who is five feet, eight inches tall and who weighs approximately 130 pounds. (Tr. 88.). Although Derrig has completed twelve grades of school in special education, (Tr. 66.), Derrig is unable to read or write. (Tr. 68.).

Derrig suffers from contact dermatitis,[3] primarily on his hands due to allergies to chemicals, petroleum products, and fertilizer. (Tr. 71.). In addition, Derrig alleges he has had muscle spasms in his neck and back since June 1990, although Derrig did not seek treatment for these spasms until September 1990. (Tr. 311.). At that time, Derrig told his treating physician, Dr. Kirk C. Koithan, that he had only had these spasms for two weeks. (Tr. 311.). Derrig sought treatment again for back pain in December 1990. (Tr. 312.). Prior to his two visits in 1990, Derrig had sought treatment for other acute ailments in 1989, unrelated to any alleged neck or back pain. (Tr. 305–06.). Also, in 1990, Derrig sought treatment after he injured his right eye in a fight, (Tr. 306.), and after he stepped on a needle. (Tr. 329.). Additionally, in 1990, Derrig obtained treatment for contact dermatitis and an injured finger. (Tr. 306–10.). On February 18, 1991, upon seeing Dr. Dan Warlick, another physician, for neck and back pain, Derrig reported to Dr. Warlick that he had suffered these symptoms for eight or nine years. (Tr. 339.). Dr. Warlick examined Derrig and found that, although Derrig did complain of muscle spasms in his neck and back, he did not have any complaints regarding limitations of his activity. Dr. Warlick further noted that Derrig's mobility of his neck and back were normal except that his ability to bend to each side was "symmetrical, although perhaps somewhat decreased from normal." (Tr. 340.). Dr. Warlick did not have a plan for Derrig's treatment; rather, he noted that "the patient returned to the care of his [treating] physician." (Tr. 340.). On February 27, 1991, Derrig once again saw his treating physician, Dr. Koithan, because his hands had been breaking out due to his allergies. (Tr. 312.). Dr. Koithan also noted that Derrig stated he had been "doing a lot of physi-

---

2. Derrig had previously filed applications for benefits pursuant to Title II and Title XVI on November 19, 1987. (Tr. 134–47.). Derrig ultimately obtained a hearing regarding this request for benefits, and an ALJ denied his request for benefits on February 28, 1989. (Tr. 198–208.).

3. Contact dermatitis is an inflammation of the skin resulting from cutaneous contact with a specific allergen or irritant. Stedman's Medical Dictionary 462–63 (26th ed. 1995).

cal labor replacing an engine in his car." (Tr. 312.). At this time, Derrig made no complaints to Dr. Koithan regarding any neck or back pain. (Tr. 312.). In March 1991, he sought treatment for a contusion on his left chest wall, resulting from a slip-and-fall incident he received while playing with his children. (Tr. 313.).

Despite Derrig's physical ailments, both parties seem to agree that Derrig's primary impairments are mental impairments. At the request of the Secretary, Derrig saw doctors David Johnson and Dan Rogers, clinical psychologists on February 4, 1992. (Tr. 360.). The psychologists concluded Derrig has borderline intellectual capacity[4] and adjustment reaction with mixed emotional features.[5] At this time, Derrig's I.Q. score on the WAIS–R examination was verbal–74; performance–85; and full–scale–79. (Tr. 360.). On the individual subtests wherein a score of ten is average, Derrig's scores were all below ten, and out of eleven subtests, six of the scores were five or below. (Tr. 360.). Based on Derrig's scores, Drs. Johnson and Rogers determined Derrig would be moderately limited in his ability to remember and understand instructions, procedures and locations; to carry out instructions; to maintain attention, concentration and pace; to interact appropriately with supervisors, co-workers, and the public; and to use good judgment and respond appropriately to changes in the workplace. (Tr. 361.). As part of their examination, the doctors rated Derrig's ability to complete work-related activities of a mental nature. In the fifteen areas rated, on a scale with a range of very good/good/fair/poor/none, Derrig scored in the "fair" range on twelve of the fifteen areas. These categories included the ability to relate to co-workers; deal with the public; use judgment; deal with work stresses; function independently; maintain attention and concentration; understand, remember and carry out complex job instructions; understand, remember and carry out detailed but not complex instructions; maintain personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. (Tr. 362–63). In the other three categories, Derrig scored in the "good" range. These three categories included the ability to follow work rules; interact with supervisors; understand, remember, and carry out simple job instructions. (Tr. 362–63.).

Regarding his work history, Derrig has held several jobs, each for a short period of time. Derrig worked as a grounds keeper at the Friendship Haven for one year, working approximately four days per week, six hours per day; however, he left that job because he was allergic to the chemicals and fertilizer to which he was exposed while working. (Tr. 70.). Derrig also washed cars and trucks part-time for six months; however, he left this job as well because of his allergies to the chemicals in the soap he used on the job. (Tr. 71–72.). In addition, Derrig had a job as a dishwasher and janitor at a restaurant, working part-time for less than a year, but

4. Borderline intellectual capacity is a category used by psychologists when the focus of clinical attention is associated with a person functioning with an I.Q. in the 71–84 range. Diagnostic and Statistical Manual of Mental Disorders 684 (4th ed. 1994).

5. The diagnostic criteria for an adjustment disorder are as follows:

A. The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

B. These symptoms or behaviors are clinically significant as evidenced by either of the following:
(1) marked distress that is in excess of what would be expected from exposure to the stressor;

(2) significant impairment in social or occupational (academic) functioning.
C. The stress-related disturbance does not meet the criteria for another specific Axis I disorder and is not merely an exacerbation of a preexisting Axis I or Axis II disorder.
D. The symptoms do not represent Bereavement.
E. Once the stressor (or its consequences) has terminated, the symptoms do not persist for more than an additional 6 months.
Additionally, an adjustment disorder with mixed anxiety and depressed mood, which is the precise type of adjustment disorder Drs. Johnson and Rogers have diagnosed Derrig as having, is a category that should be used by psychologists when the predominant manifestation is a combination of depression and anxiety. Diagnostic and Statistical Manual of Mental Disorders 624, 626 (4th ed. 1994).

once again, his allergies caused him to leave this job. (Tr. 73.). In his next job, Derrig worked as a mechanic's helper, working approximately two years for his brother-in-law. (Tr. 73.). This position was not a full-time position; rather, Derrig worked whenever his brother-in-law needed help. (Tr. 73–74.). Although the record does not clearly indicate why Derrig left this position, Derrig's aunt testified Derrig left following some "trouble on the job." (Pl.'s Brief p. 3.). Derrig also was employed as a part-time construction laborer, a job which required him to pour concrete and lift up to twenty-five pounds on a regular basis. (Tr. 76.). However, he left that job because of his allergies to the concrete mixture. (Tr. 76.). Derrig also worked part-time as a laborer in a sewing factory, in which he was required to lift approximately fifty pounds. (Tr. 74–77.). Derrig was forced to leave this job as well due to his allergies. (Tr. 75.). In addition, Derrig worked part-time in a convenience store, although his inability to read or write prevented him from restocking shelves. (Tr. 67.). Derrig left this job because of his allergies to chemicals used in completing cleaning chores. (Tr. 68.). Also, Derrig worked on a road crew for a couple of days, but he left this job because he was allergic to asphalt. (Tr. 68–69.). Although Derrig alleged he became disabled on March 1, 1989, a Iowa Division of Vocational Rehabilitation counselor noted that Derrig was self-employed, hauling junk and cleaning property in late 1989 and early 1990. (Def.'s Brief p. 2, Tr. 296.).

This case had originally been set for a hearing on March 26, 1992, (Complaint ¶ 6.), but it was continued to allow Derrig time to obtain an attorney. (Pl.'s Brief, p. 7.). Prior to that first hearing date, in 1992, the Social Security Administration received an anonymous phone call, reporting that Derrig advertised in the local newspaper and on the side of his truck an offer of his services for hauling and other similar work. (Pl.'s Brief, p. 7.).

At the administrative hearing held on April 26, 1993, Derrig complained of several physi-

cal impairments, including allergies to chemicals and back pain. (Tr. 94.). Derrig further asserted he received medication and shots for his allergies and took Diflunisal [6] for his back pain. Derrig cited the pain in his back as an aching pain that "comes and go[es]," usually lasting until he took medication to alleviate his discomfort. (Tr. 94.). Derrig testified he did not have problems walking, but his back started to hurt while standing. (Tr. 95.). In addition, Derrig alleged he has difficulty bending, stooping, and squatting repeatedly. (Tr. 96.). Derrig testified he has no problem using his hands and claimed he could lift a ten pound bag of flour, but he complained he feels sharp pain in his shoulder when pushing things away from him. (Tr. 97.). Derrig also alleged he feels discomfort after sitting for long periods of time. (Tr. 97.). Derrig claimed he does not get along with his neighbors because of lack of employment and his allergies to petroleum products. (Tr. 98–99.). Also, Derrig claimed he has difficulty sleeping, at times sleeping for only two or three hours, waking up, and being unable to fall asleep again. (Tr. 99.).

Regarding his daily activities, Derrig is able to feed, dress, and bathe himself. (Tr. 100.). He claimed he has no hobbies, although he used to bowl until the pain in his back made it uncomfortable for him to continue. (Tr. 100.). His aunt, Darlene Patton, testified at the administrative hearing that she helps him with his laundry, fixes several meals for him and his family, and helps with the grocery shopping. (Tr. 100.). Patton claimed she usually saw Derrig four or five times per week. She also stated her opinion that Derrig's brother had made the anonymous phone call to the Social Security Administration claiming that Derrig was advertising his services, offering to complete hauling jobs, as well as other tasks. (Tr. 105.). Derrig's brother suffers from schizophrenia and allegedly does not want Derrig to obtain social security benefits. (Tr. 105.). Patton also testified about Derrig's mental impairments, claiming that he cannot remember simple instructions, e.g., "how to make chili." (Tr. 106.), or remembering events in general.

6. Diflunisal is a salicylic acid derivative with anti-inflammatory, analgesic, and antipyretic ac- tions. Stedman's Medical Dictionary 482 (26th ed. 1995).

(Tr. 107.). Patton also claimed Derrig could not keep his attention focused on task with much success, although she could not cite an example of an occurrence of this alleged deficiency. (Tr. 106–07.). Although she had never seen Derrig perform any of the jobs in his work history, Patton opined Derrig does not handle supervision well because he would get mad or upset with his brother-in-law when he wouldn't understand something. (Tr. 108.). Patton testified that based on her experience in dealing with Derrig, it was her opinion that he could not manage to go to work without being late and that he could not handle a stressful situation in the workplace or otherwise. (Tr. 108.). Patton witnessed episodes where Derrig would cry because he was under much stress, and Derrig himself told Patton that he had cried while working for his brother-in-law and for Friendship Haven because he had difficulty comprehending what he was supposed to be doing on the job.

George Paprocki testified as a vocational expert at the administrative hearing. First, the administrative law judge asked Paprocki to refer to Derrig's past relevant work summary and determine if Paprocki agreed with the conclusions in the summary. (Tr. 113–14.). Among the changes Paprocki suggested, he stated he would add the job of "material handler," which Paprocki claimed was an accurate classification of the work Derrig performed at Mid Continent Lumber Company. (Tr. 114.). Paprocki classified this job as unskilled work activity that is considered heavy work in the economy, but was performed at a medium level by Derrig. (Tr. 114.). Specifically, the following exchange occurred between the ALJ and Paprocki:

Q. ... we have an individual who is currently 36 years old and was 36 years old as of the alleged onset date of disability. He's a male. He has a high school education, although it was achieved in special education and he is functionally illiterate. And he has past relevant work as a grounds keeper, dishwasher, mechanic helper, laborer, laborer construction and as a materials handler, and he has the following impairments: medically determinably disorder resulting in complaints of low back and neck pain, neurological deficiency of the right index finger, contact dermatitis, borderline intelligence and an adjustment reaction with mixed emotional features. And as a result of the combination of those impairments, he has the physical and mental capacity to perform work related activities except for lifting of no more than 50 pounds, routinely lifting 25 pounds, with no continuous bending or stooping. He should perform no work where he is involved ... with the contact of the extremes of dust, fumes, petroleum, distillates, or fertilizers. He is able to do only simple, routine, repetitive work, not relying on written instructions or mathematical computations or requiring constant close attention to detail or use of independent judgment for decision making. He does require occasional supervision and should not work at more than a regular pace. Would this individual be able to perform any job he previously worked at either as he performed it or as it is generally performed within the national economy and, if so, would you please specif[y] which job?

A. I think the job as a materials handler as he performed the work would be feasible. That's at a medium level. I don't believe it would require continuous bending or stooping, and I don't think you're talking about any types of chemicals or extremes of dust or that type of matter. In addition, the work would be directly supervised, simple routine, repetitive. I think all of the other work that he did it was my understanding if I'm correct[ly] listening to the testimony, that he had difficulty with the petroleum distillates or, or fumes from various materials that he was handling such as the, the semi tarps for example, and the dish washing, the dish washing soap.

Q. The way he performed the job as a materials handler, is that similar to the way the job is normally performed in the national economy?

A. I think so. Generally it's a matter of retrieving or, or stocking various supplies. How did you mean that exactly? It sounded to me like what he was doing was consistent with, with someone working in a, a lumber yard retrieving supplies, helping customers do.. to get supplies. You

go to [Menard's] or some place like that, there's a, there's a yard man who is essentially a materials handler, tell you where, where things are stored.

Q. That's basically what my question was. My next assumption is that we have an individual of the same age, sex, education, past relevant work and impairments as previously specified.. And this would be an individual who would have the physical and mental capacity to perform work related activities except for lifting of no more than 10 pounds, with no standing of more than an hour at a time, no sitting of more than an hour at a time, with no repetitive bending, stooping, squatting or climbing, no repetitive pushing or pulling. This individual should not be exposed to excessive dust, fumes or petroleum based chemicals. He is able to do only simple, routine, repetitive work, not relying on written materials or mathematical computations or requiring close attention to detail or use of independent judgment for decision making. He should have no more than occasional contact with the public. He does require occasional supervision and he should work at no more than a regular pace. Would this individual be able to perform any jobs he previously worked at either as he performed it or as it is generally performed within the national economy?

A. I don't believe so. I think all of his work required more than 10 pounds of, of lifting, and most of the work I would say had very little, if any latitude for change of position or, or sitting. The work he did was essentially standing. Some of the work also involved fumes. And I think most of the work involved bending, which would be in the repetitive class as well. (Tr. 115–17.). Paprocki further stated that Derrig did not have any acquired skills in his past relevant work which he could transfer to other jobs existing in the national economy reflecting the functional capacity in the prior hypothetical. (Tr. 117–18.). Furthermore, Paprocki noted that with the ten-pound lifting limitation and the inability to sit for longer than an hour at a time, Derrig could not perform the full range of work, light or sedentary in nature. (Tr. 118.). However, even with the above limitations in the hypo-

thetical, Paprocki thought Derrig could perform jobs, such as factory activities, assembly line tasks, and hand packaging tasks. (Tr. 118–19.).

Derrig's attorney, Dan Wilmoth, asked the vocational expert some follow-up questions regarding the judge's hypotheticals. Wilmoth asked Paprocki if the same jobs would be available if he added to the prior hypothetical "a 'fair' ability to deal with work stress," with fair being the middle point between having no limitation and having no ability to deal with work stress. (Tr. 120.). Paprocki asserted that the assembly/factory activity jobs he mentioned would still be available because they were jobs that are done at a regular pace, as opposed to keeping up with a machine. (Tr. 121.). If a person was dependent on other people as with an assembly line, this person would likely experience more stress than one working in the positions Wilmoth previously indicated. (Tr. 121.). Wilmoth further added to the hypothetical "a 'fair' ability to relate to co-workers and supervisors." (Tr. 121.). Again, Paprocki thought the assembly/factory activity jobs would still be available because the need for direct communication with other individuals in these positions would be very limited. However, Paprocki acknowledged, "[i]f [the work] was team tasks or something where . . . his efforts had to coordinate with somebody else's, let's say operating a punch press where you both pick up the piece at the same time, that may . . . present a different kind of problem." (Tr. 121–22.). Wilmoth also added "a 'fair' ability to maintain attention and concentration" to the hypothetical. (Tr. 122.). Paprocki responded as follows:

I would say these jobs would still be feasible [with only a fair ability] inasmuch as you're talking about something which is 1, 2, 3–step short cycle repetitive in nature. In other words, it's difficult to, to lose what you're doing . . ., the work is so short cycled before you start doing it again. And if you do goof up and, and forget what you're doing, it's easy to see where you are if you, you know, think about it a little as opposed to if, if you were doing a job that required something that changed from minute to minute or even, or even every

half hour he was doing something else. Then I think more concentration would, would be necessary. But these are the ... lowest level of jobs, entry level jobs. If you don't have the concentration to maintain a pace on these particular jobs, you would be unable to do anything in the way of repetitive activity.

(Tr. 123.). Finally, Wilmoth asked Paplocki to address the cumulative effect of the three additional limitations Wilmoth introduced into the ALJ's prior hypothetical, in addition to "a 'fair' ability to use judgment," on the availability of assembly/factory activity jobs. (Tr. 123.). Paplocki stated he did not perceive the limitation of having only a fair ability to use judgment as having any effect on the availability of the aforementioned jobs because these are unskilled jobs where a person would be directly supervised, and there would be no need for independent judgment. (Tr. 123–24.). Furthermore, Paplocki noted a person with all these problems collectively could have a greater potential to exhibit one or more of these hindrances on the job. (Tr. 124.). However, Paplocki reiterated that each of these limitations individually would not pose significant problems in these types of jobs. (Tr. 124.).

In his decision, the ALJ concluded that Derrig does not have an impairment or combination of impairments which prevent him from performing his past relevant work or any other work that exists in significant numbers in the national economy. Furthermore, the ALJ found that Derrig was "not disabled," as defined in the Social Security Act. With this factual background in mind, the court will now review its jurisdictional basis for hearing this case and then analyze the ALJ's ruling.

### C. The Court's Jurisdictional Basis

In *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the United States Supreme Court described the procedural steps leading up to a district court's review of Social Security appeals as follows:

The initial disability determination is made by a state agency acting under the authority and supervision of the Secretary. 42 U.S.C. § 421(a), 1383b(a); 20 CFR §§ 404.1503, 416.903 (1986). If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process. First, the determination is reconsidered *de novo* by the state agency. §§ 404.909(a), 416.1409(a). Second, the claimant is entitled to a hearing before an administrative law judge (ALJ) within the Bureau of Hearings and Appeals of the Social Security Administration. 42 U.S.C. §§ 405(b)(1), 1383(c)(1) (1982 ed. and Supp. III); 20 CFR §§ 404.929, 416.1429, 422.201 *et seq.* (1986). Third, the claimant may seek review by the Appeals Council. 20 CFR §§ 404.967 *et seq.*, 416.1467 *et seq.* (1986). Once the claimant has exhausted these administrative remedies, he may seek review in federal district court.

*Yuckert,* 482 U.S. at 142, 107 S.Ct. at 2291.

Section 1383(c)(3) of Title 42 of the United States Code provides that "(t)he final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title...." In pertinent part, 42 U.S.C. § 405(g) states the following:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.... The judgment of the court shall be final

except that it shall be subject to review in the same manner as a judgment in other civil actions. . . .

42 U.S.C. § 405(g) (Supp.1995).

■■■■ Accordingly, the court has the power to affirm, reverse or remand the ALJ's decision, and "(w)here the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir.1992) (citing *Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir.1989)); *see also Simmons v. United States R.R. Retirement Bd.*, 982 F.2d 49, 57 (2d Cir.1992) (citing *Thompson*, 957 F.2d at 614; *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980) (reversal proper where remand "would serve no purpose")); *Gavin v. Heckler*, 811 F.2d 1195, 1202 (8th Cir.1987) (reversal proper where "remand would be a futile gesture"). The court, however, cannot grant a remand merely because it is unhappy with the ALJ's result, *Melkonyan v. Sullivan*, 501 U.S. 89, 100–01, 111 S.Ct. 2157, 2164, 115 L.Ed.2d 78 (1991), or "'because substantial evidence would have supported an opposite decision.'" *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir.1995) (quoting *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir.1993) in turn quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)). Further, in order to remand a case such as this one, which falls under sentence four of 42 U.S.C. § 405(g),[7] the court must either affirm, modify or reverse the decision so that it will be considered a final judgment. *Melkonyan*, 501 U.S. at 101, 111 S.Ct. at 2164; *see also Shalala v. Schaefer*, — U.S. ——, ——, 113 S.Ct. 2625, 2627, 125 L.Ed.2d 239 (1993) (holding "a district court remanding a case pursuant to sentence four of § 405(g) must order judgment in the case and may not retain jurisdiction over the administrative proceedings on remand."). With this jurisdictional basis in mind, the court now turns to the standards to be applied upon review.

## II. ANALYSIS

### A. The "Substantial Evidence" Standard

■■■■ The Eighth Circuit's standard of review in Social Security cases is well-established. This court must affirm the findings of the ALJ if they are supported by substantial evidence in the record as a whole. *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir.1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir.1992) (citing *McMillian v. Schweiker*, 697 F.2d 215, 220 (8th Cir.1983)); 42 U.S.C. § 405(g). "'Substantial evidence is less than a preponderance' . . ." *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992)), but "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales*, 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *see also Smith*, 31 F.3d at 717 (citing *Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir.1991)); *Metz v. Shalala*, 49 F.3d 374, 376 (8th Cir.1995). Put another way, "(t)he standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.'" *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994) (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir.1991), which, in turn, quoted *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir.1988)).

■■■■ When evaluating the evidence in an appeal from the Secretary's denial of benefits, the court must perform a balancing test, evaluating any contradictory evidence. *Sobania v. Secretary of HHS*, 879 F.2d 441, 444 (8th Cir.1989) (citing *Gavin*, 811 F.2d at 1199). "(I)f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's

---

7. Sentence four of § 405(g) provides that:
   The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the Secretary, with or without remanding the cause for a rehearing.
42 U.S.C.A. § 405(g) (pocket part 1994).

findings, [this court] must affirm the [Secretary's] decision." *Orrick,* 966 F.2d at 371; *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989). Even if this court "might have weighed the evidence differently, [it] may not reverse the Secretary's decision when there is enough evidence in the record to support either outcome." *Culbertson,* 30 F.3d at 939 (quoting *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)). In other words, the court "must consider evidence that detracts from the Secretary's decision as well as evidence that supports it. [The court] may not, however, reverse the Secretary's decision merely because substantial evidence also would have supported an opposite decision." *Frankl,* 47 F.3d at 937 (citing *Smith,* 987 F.2d at 1374 (8th Cir.1993)).

■ "Review under this standard is not a rubber stamp for the ALJ, however." *Griffon v. Bowen,* 856 F.2d 1150, 1153 (8th Cir. 1988) (citing *McMillian,* 697 F.2d at 220). The court must at all times keep in mind that prior to granting or denying benefits, the ALJ has a duty to fully and fairly develop the record. This mandate was recently summarized as follows:

> The Secretary acknowledges that it is her "'duty to develop the record fully and fairly, even if ... the claimant is represented by counsel.'" *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992) (quoting *Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983)). This is so because an administrative hearing is not an adversarial proceeding. *Henrie v. Dep't of Health & Human Serv.,* 13 F.3d 359, 361 (10th Cir.1993) (citing *Dixon v. Heckler,* 811 F.2d 506, 510 (10th Cir.1987)). "[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988). Moreover, "[a]n adequate hearing is indispensable because a reviewing court may consider only the Secretary's final decision [and] the evidence in the administrative transcript on which the decision was based."

*Battles v. Shalala,* 36 F.3d 43, 44–45 (8th Cir.1994) (quoting *Higbee v. Sullivan,* 975 F.2d 558, 562 (9th Cir.1992) (per curiam)).

With these standards in mind, the court will now turn to the ALJ's evaluation of Derrig's case.

## B. The Polaski Standard and Subjective Pain Credibility Determinations

■ "An ALJ's credibility determinations are, of course, entitled to considerable weight." *Young v. Secretary of Health and Human Servs.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir.1987)); *see also Gooch v. Secretary of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988); *Hardaway v. Secretary of Health and Human Servs.,* 823 F.2d 922, 928 (6th Cir.1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit allegations of pain merely because of a lack of objective evidence; instead, he may discredit subjective complaints of pain only if they are inconsistent with the record as a whole. *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir.1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322, *supplemented,* 751 F.2d 943 (8th Cir.1984), *vacated,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 *adhered to on remand,* 804 F.2d 456 (8th Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)). Under *Polaski,*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
>
> 2) the duration, frequency and intensity of the pain;
>
> 3) precipitating and aggravating factors;
>
> 4) dosage, effectiveness and side effects of medication;
>
> 5) functional restrictions.

*Polaski,* 739 F.2d at 1322. In other words, under *Polaski,* an ALJ is free to doubt a claimant's subjective pain complaints. However, he must support a denial of benefits based on a consideration of the above-men-

tioned five factors. Indeed, the *Polaski* court stated that "(t)he adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* (emphasis in original).

As the Tenth Circuit has stated, "(t)o establish disabling pain without the explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony evaluated by the ALJ and weighed alongside the medical evidence." *Huston v. Bowen*, 838 F.2d 1125, 1131 (10th Cir.1988) (citing *Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir.1987)); *see also Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir.1986); *Avery v. Secretary of Health and Human Servs.*, 797 F.2d 19, 21 (1st Cir.1986); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.1986); *Green v. Schweiker*, 749 F.2d 1066, 1070 (3d Cir.1984).

### C. Relative Burdens of Proof

A "disability" is defined in 42 U.S.C. § 423(d) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (1994). A disability is found when a claimant is "not only unable to do his previous work but cannot, considering ... his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy ... either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A) (1994).

■ "To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl*, 47 F.3d at 937 (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir.1993)); *see also Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir.1995) (citing *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir.1992)); 20

C.F.R. § 404.1512(c); *see also Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir.1994). "If met, the burden of proof then shifts to the Secretary to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and work experience." *Frankl*, 47 F.3d at 937 (citing *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc); 20 C.F.R. §§ 404.1520(f), 416.920(f)). *See also Johnston*, 42 F.3d at 451 (citing *Turpin v. Bowen*, 813 F.2d 165, 170 (8th Cir.1987)); *Hajek v. Shalala*, 30 F.3d 89, 93 (8th Cir. 1994) (citing *Evans v. Shalala*, 21 F.3d 832, 835 (8th Cir.1994)); *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir.1994); *Smith*, 31 F.3d at 717 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir.1991); *Hajek*, 30 F.3d at 93 (citing *Evans*, 21 F.3d at 835); *Walker v. Shalala*, 993 F.2d 630, 632 (8th Cir.1993) (citing *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir.1992)); *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir.1993)); *Edwards v. Secretary of Health and Human Servs.*, 809 F.2d 506, 507 (8th Cir.1987); *McCoy v. Schweiker*, 683 F.2d at 1142.

### D. Review of the ALJ's Decision

■ The ALJ determined Derrig's impairments did not prevent him from performing his past relevant work as a materials handler. Therefore, the ALJ found that Derrig was not disabled within the definition of 42 U.S.C. § 405(g), at any time through the date he was last insured, December 31, 1992. (Tr. 26–27.); *see* 20 C.F.R. § 404.1520(e)) (stating the rule that a person who can perform his past relevant work will be found "not disabled"). The issue for the court is whether the ALJ's decision was supported by substantial evidence. To make this determination, the court will now address the parties' arguments individually and conduct a review of the ALJ's order and the record as a whole.

### 1. Derrig's disability insured status

■ The ALJ noted that to be eligible for benefits under Title II, a claimant must show

he had been disabled prior to the expiration of his insured status. The court recognizes this requirement as a preliminary criteria for Derrig's entitlement to benefits. *See Hinchey v. Shalala,* 29 F.3d 428, 431 (8th Cir. 1994) (citing *Potter v. Secretary of Health and Human Servs.,* 905 F.2d 1346, 1348–49 (10th Cir.1990) (per curiam)); *Battles v. Sullivan,* 902 F.2d 657, 659 (8th Cir.1990) (finding a claimant must establish her disability existed prior to the time her insured status expired). According to his earnings record, Derrig's disabled insured status expired on December 31, 1992. (Tr. 251.). Consequently, Derrig must show he had been disabled prior to December 31, 1992, and any subsequent impairments that may have developed after this date cannot be considered in the determination of benefits. With this time frame in mind, the court turns to the question of whether the ALJ's determination that Derrig was not disabled prior to December 31, 1992, is supported by substantial evidence.

### 2. The ALJ's analysis of Derrig's subjective pain complaints

#### a. Derrig's prior application for benefits

■ Because Derrig had previously filed an application for disability benefits that had ultimately been denied by an ALJ, the court must establish the scope of its review of Derrig's medical evidence, both objective and subjective. Regarding Derrig's prior application for benefits, the ALJ held Derrig was not disabled in a final decision on February 28, 1989. (Tr. 198–208). Where a claimant has previously been denied social security disability benefits, the claimant must demonstrate his medical condition has become disabling after the date of this previous decision. *See Nelson v. Sullivan,* 966 F.2d 363, 364 n. 3 (8th Cir.1992) (regardless of the date the claimant alleges as the onset of his disability, if there has been a final decision regarding a prior application, the claimant must establish his condition became disabling after the date of the prior decision); *Gavin v. Heckler,* 811 F.2d 1195, 1199–1200 (8th Cir. 1987) (noting once a decision on a disability claim becomes final, "if it is not appealed to the district court pursuant to 42 U.S.C. 405(g), it may not be reviewed by the district

court as part of its review of another, subsequent decision by the Secretary," quoting, in turn, *Wilson v. Califano,* 580 F.2d 208, 211 (6th Cir.1978)). In addition, at least one court has held there is a presumption that a claimant's nondisability status as determined in a prior hearing continues. *See Fair v. Bowen,* 885 F.2d 597, 600 (9th Cir.1989); *Green v. Heckler,* 803 F.2d 528, 530 (9th Cir.1986). Derrig has alleged the onset of his disability for purposes of this particular request for benefits occurred on March 1, 1989. (Tr. 217.). Therefore, Derrig must show that his condition became disabling after February 28, 1989, the date of the ALJ's previous denial of benefits to support a finding of disability pursuant to the Social Security Act. Accordingly, the court limits its review of the record to evaluating whether substantial evidence exists in the record to support the ALJ's finding that Derrig's medical condition did not become disabling after February 28, 1989.

#### b. Inconsistencies regarding Derrig's physical impairments

■ The ALJ recognized inconsistencies between Derrig's pain complaints and his visits and subsequent treatment by physicians. The ALJ asserted that, while Derrig alleged he has suffered from muscle spasms in his back and neck since June 1990, he did not receive treatment for this pain until September 1990, at which point he alleged that he had only suffered from neck pain which began two weeks prior to that appointment. The doctor at the time diagnosed Derrig with an acute cervical strain/sprain with muscle spasm. Furthermore, Derrig was treated twice in June 1990 for a laceration to his finger and twice in August for a puncture wound to his heel obtained by stepping on a needle. (Tr. 310–11). Derrig never complained of neck or back pain at any of these appointments. (Tr. 310–11). Also, in December 1990, although Derrig complained of back pain, the ALJ noted the doctor found no objective signs of a disabling degree of pain. (Tr. 312.). In addition, when Derrig received treatment in February 1991 for contact dermatitis, he made no continuing complaints of back pain or neck pain to his treating physi-

cian. (Tr. 312.). The ALJ noted this lack of complaints regarding his back pain or neck pain weighed against Derrig's credibility, considering Derrig also told his doctor in February that he had been "doing a lot of physical labor replacing an engine in his car." (Tr. 312.). Furthermore, Derrig saw his physician once again in March 1991 after he slipped and fell while playing with his children. (Tr. 313.). The doctor found a contusion on his left chest wall, but five days later, Derrig revisited the doctor, who noted an improvement in his condition. (Tr. 313).

The ALJ recognized that in February 1991, Derrig saw Dr. Dan Warlick, a physician practicing generally in direct patient care. (Tr. 340.). At this time, Derrig complained he was bothered by intermittent muscle spasms in his back and neck, but he never complained of these recurring spasms to his treating physician, Dr. Kirk Koithan. (Tr. 340.). Dr. Warlick noted Derrig complained of the muscle spasms, but did not complain of any limitation of activity. (Tr. 340.). The ALJ noticed that Dr. Warlick found no objective evidence to support a disabling degree of pain. In fact, Dr. Warlick noted in his records that Derrig's flexion and extension of his elbows, hips, knees, ankles, and toes were all normal, in addition to the mobility in his shoulders, in which Derrig complained he felt numbness. (Tr. 340.). In addition, Dr. Warlick found that Derrig's balance and gait were normal. Also, Dr. Warlick acknowledged Derrig's ability to "bend his neck well down and as well bend his back so that he could reach down and touch his toes easily." (Tr. 340.). Derrig's rotation of his neck and shoulders also appeared normal. Dr. Warlick's plan of treatment merely involved referring him back to his treating physician. The ALJ opined this sole allegation of neck and back pain, considering Derrig's silence to his treating physician about his persistent neck and back spasms at other subsequent times and the lack of objective evidence to support a disabling degree of pain, did not bolster Derrig's credibility regarding his complaints of neck and back pain. The ALJ maintained this evidence, in combination with Derrig's activities involving replacing an engine and his inconsistent recollection of when he began to have neck and

back pain, is substantial evidence that detracts from Derrig's credibility regarding his allegations of disability from physical impairments. (Tr. 21.).

Furthermore, the ALJ recognized that the doctors who either treated Derrig for his complaints of neck and back pain or who reviewed this evidence indicated that Derrig should only be limited to a medium exertional capacity, (Tr. 342.), and one doctor found Derrig should not be limited at all. (Tr. 353.). In addition, at the hearing, Derrig testified that his back pain was an aching, sharp pain that would come and go and would last until he took medications. (Tr. 94–95.). The ALJ contended that even when Derrig felt sporadic pain, the pain subsided when he took medication, of which the ALJ found no credible side effects. (Tr. 23.).

The court is aware that an ALJ may not discredit allegations of pain merely because of a lack of objective evidence; instead, he may discredit subjective complaints of pain only if they are inconsistent with the record as a whole. *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir.1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322, *supplemented,* 751 F.2d 943 (8th Cir.1984), *vacated,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, *adhered to on remand,* 804 F.2d 456 (8th Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)). Here, the ALJ has not discredited Derrig's allegations of pain merely because of the lack of objective evidence that Derrig suffered from disabling neck and back pain. Not one doctor who either treated Derrig or reviewed the medical evidence for purposes of determining eligibility for benefits indicated that Derrig's pain approached a level of disability. In addition, not one doctor recommended that Derrig should not work due to his neck and back pain. Even though Dr. Warlick stated it was his impression Derrig did have chronic back pain, Dr. Warlick found that Derrig did not appear to be limited in his activities, and there were no indications of a severe level of pain or a musculoskeletal impairment. On the contrary, Derrig appeared to have much mobility, considering the pain of which he complained. Therefore,

the court recognizes there is substantial objective medical evidence indicating that, at least prior to December 31, 1992, Derrig was not disabled.

█ Furthermore, regarding the ALJ's alleged inconsistencies, during Derrig's visits to the doctor before and after his alleged onset of muscle spasms in the neck and back in June 1990, Derrig did not mention his neck and back pain on several occasions with his treating physician, Dr. Koithan. In addition, he told Dr. Koithan in September 1990 that he had only had symptoms of neck and back pain for two weeks, although he testified that he began to experience these same symptoms in June 1990, approximately four months before the time he alleged to his doctor. Also, in February 1991, Derrig informed Dr. Warlick he began to have neck and back pain "eight or nine years ago," and since that initial onset of pain, he had suffered from intermittent muscle spasms in his neck and back. (Tr. 339.). Derrig's counsel has argued that to discredit Derrig because of his inability to recall events within a two or three month period after a three-year lapse of time might be unduly harsh, especially considering Derrig's documented mental deficiencies. The court agrees such a characterization might be unwarranted; however, there is a discrepancy of eight or nine years between the times Derrig has indicated regarding the onset of his alleged muscle spasms. Additionally, the ALJ can find a claimant's failure to seek significant medical attention to be inconsistent with a finding of disability. *See Benskin v. Bowen*, 830 F.2d 878, 884 (8th Cir.1987); *Edwards v. Secretary of Health and Human Servs.*, 809 F.2d 506, 508 (8th Cir.1987). As noted above, Derrig testified he had symptoms of muscle spasms in June 1990 and told another doctor he had been plagued by these symptoms for eight or nine years. (Tr. 339.). Yet Derrig did not seek treatment for these spasms until September 1990. Derrig's failure to seek prompt, aggressive treatment does not indicate that he was suffering from disabling pain. *See Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir.1988). The court therefore agrees with the ALJ's finding that this inconsistency discredits Derrig's subjective pain complaints.

Derrig's admission that he had been "doing a lot of physical labor replacing an engine" may not alone create an inconsistency that would warrant discrediting Derrig's testimony. However, Derrig made that admission just over a week after he visited Dr. Warlick, complaining of neck and back spasms that had plagued him for eight or nine years. Furthermore, that inconsistency, combined with the inconsistency regarding the onset of his physical symptoms, and his admission that his intermittent physical pain subsides with medication, create inconsistencies regarding Derrig's subjective pain complaints in the record as a whole. Consequently, the court concludes the ALJ correctly found inconsistencies between Derrig's subjective pain complaints and the record and properly discredited Derrig based on those inconsistencies.

### c. Evidence regarding Derrig's mental impairments

The ALJ found that based on a psychological assessment conducted in 1992, Derrig has borderline intellectual capacity and an adjustment reaction with mixed emotional features. Additionally, the psychologists indicated Derrig would be moderately limited in his ability to remember and understand instructions, procedures and locations; to carry out instructions; to maintain attention, concentration and pace; to interact appropriately with supervisors, coworkers, and the public; and to use good judgment and respond appropriately to changes in the work place. (Tr. 361.). Also, Derrig's abilities to make occupational, performance, and personal-social adjustments were considered "fair," with a classification of a "good" ability in three of the fifteen separate categories. (Tr. 362–63.). The ALJ alleged he accounted for these limitations on Derrig's abilities in his hypothetical to the vocational expert by limiting the claimant in the hypothetical to performing only simple, routine, repetitive work, not relying on written material or mathematical computations or requiring constant, close attention to detail or use of independent judgment for decision making. (Tr. 22, 115.). Even with these mental limitations included in the hypothetical, the vocational expert tes-

tified Derrig could perform his past relevant work as a materials handler. (Tr. 22).

In addition, Derrig has asserted his illiteracy keeps him from performing work. However, the ALJ noted that, according to the Social Security regulations, "while illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance." *See* Appendix 202.00(g), Subpart P, Regulation No. 4. Therefore, the ALJ argued Derrig's impaired mental functioning, including his illiteracy, is not a basis for disability. (Tr. 22.).

The court recognizes Derrig has mental limitations that would, in fact, preclude him from performing many jobs in the national economy. However, this is not the question before the court. The court must look at the precise issue of whether the ALJ's findings regarding Derrig's mental impairments were supported by substantial evidence. Here, the ALJ considered Derrig's mental impairments and included the appropriate limitations within his hypothetical to the vocational expert. Derrig's mental ailments and his illiteracy cannot alone entitle him to a finding of disability when substantial evidence clearly indicates an opposite finding. Furthermore, Derrig has not shown how his mental impairments have deteriorated or become disabling since the date of the prior decision denying him benefits under the Social Security Act, and the court has found no evidence in the record indicative of a recent disability. Therefore, the court concludes the ALJ correctly found that Derrig's mental impairments do not render him disabled.

### d. Inconsistencies regarding Derrig's daily and work-related activities

The ALJ noted that Derrig's daily activities and his work-related activities are inconsistent with Derrig's subjective pain complaints. The ALJ acknowledged that Derrig's range of daily activities was fairly extensive, particularly in caring for his children. Among the significant items in his list of regular activities are watching television with his children, shooting baskets, washing dishes, and driving fifteen to twenty miles a week. (Tr. 262.). Although his aunt helps him with the laundry, grocery shopping, and some of the cooking, the bulk of Derrig's regular activities indicate a very small restriction from any impairment, physical or mental. In fact, the ALJ found Derrig's difficulties in maintaining social functioning to be slight, considering he appears to get along with his girlfriend and his aunt, and cares for and plays with his children on a regular basis. (Tr. 22.). The ALJ also noted Derrig's alleged deficiencies in concentration were inconsistent with his ability to maintain a driver's license and to handle the task of driving despite his mental impairments. (Tr. 22.). In regards to Derrig's work-related activity, the ALJ acknowledged the Social Security Administration's receipt of an anonymous phone call who suggested that Derrig was advertising in a local newspaper and on the side of his truck that he would do hauling, painting, mowing, and other yard work. (Tr. 23.). Derrig criticized the ALJ's reliance on this phone call, and both Derrig and his aunt have alleged Derrig's brother who suffers from schizophrenia made that call. Therefore, Derrig argues the phone call should not be used to discredit the validity of his disability claim.

The court acknowledges the receipt of an anonymous phone call alone should not suffice to discredit a claimant's testimony. *See McClees v. Sullivan,* 879 F.2d 451, 454 (8th Cir.1989) (an anonymous phone call to the Social Security Administration is mere hearsay which lacks reliability and is not substantial evidence to overcome the sworn testimony of the claimant). *But see Green v. Shalala,* No. 93–7068, 17 F.3d 1436 (10th Cir. Mar. 1, 1994) (anonymous contact report casted severe doubt on the credibility of the claimant, as well as that of the medical evidence contained in the record). Here, however, the ALJ did not solely rely on the anonymous phone call to discredit Derrig. The ALJ stated in his opinion that evidence of this phone call was merely cumulative to other inconsistencies in the record that Derrig himself created. Therefore, because the ALJ considered this piece of evidence in

conjunction with other inconsistencies in the record, the court is not persuaded the ALJ's consideration of the phone call was improper. Furthermore, regarding Derrig's daily activities, Derrig's activities do not appear to have been greatly affected or limited by his impairments. The ALJ's findings, coupled with the fact that Derrig's supervisor at the Friendship Haven noted Derrig was a steady, reliable employee who had exhibited satisfactory behavior in his relationships with both supervisors and co-workers, (Tr. 288.), indicate Derrig's large range of daily and work-related activities is inconsistent with his allegations of a disabling degree of pain.

### 3. S.S.R. 85–15 and the hypothetical questions

Derrig argues he is disabled under S.S.R. 85–15, which provides that a substantial loss of ability to meet any of several basic work-related activities would severely limit the potential occupational base. This limitation would, pursuant to this regulation, justify a finding of disability. See S.S.R. 85–15. However, this regulation only applies if the claimant cannot return to his past relevant work. See Ramey v. Shalala, 26 F.3d 58, 61 (8th Cir.1994); Galarza v. Secretary of Health and Human Servs., No. 93–1703, 19 F.3d 7 (1st Cir. Mar. 10, 1994). Therefore, the court must determine if the ALJ's hypothetical questions that he posed to the vocational expert fully represented Derrig's impairments, thereby resulting in the vocational expert's conclusion that Derrig could return to his past relevant work.

An ALJ's hypothetical question must fully describe a claimant's impairments. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir.1995) (citing Shelltrack v. Sullivan, 938 F.2d 894, 898 (8th Cir.1991)). If vocational expert testimony is based upon an insufficient hypothetical question, it "does not constitute substantial evidence to support a finding of no disability." Id. However, "[w]hile it is clear that 'questions posed to vocational experts ... should precisely set out the claimant's particular physical and mental impairments,' Greene v. Sullivan, 923 F.2d 99, 101 (8th Cir.1991), a proper hypothetical question is 'sufficient if it sets forth

the impairments which are accepted as true by the ALJ.'" House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994) (citing Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir.1985)). Therefore, the court's analysis of the sufficiency of the ALJ's hypothetical question involves a determination of whether the impairments accepted by the ALJ were appropriate.

The ALJ included the lifting restrictions of twenty-five pounds on a regular basis, and fifty pounds on an occasional basis. Although Derrig said he was not sure if he could lift more than a ten-pound bag of flour, his work history indicates that in one job as a construction laborer, he lifted twenty-five pounds on a regular basis. In his job at the sewing factory, Derrig lifted approximately fifty pounds occasionally. Furthermore, these limitations are consistent with the recommendation of the physician who reviewed the medical evidence supporting Derrig's physical impairments. (Tr. 348.). Considering that no physician who treated Derrig after the date of the prior denial of benefits placed a limitation on Derrig's lifting ability and Derrig's work history, the court concludes this weight-lifting limitation within the hypothetical fully describes Derrig's limitation regarding his back pain.

The ALJ also included Derrig's allergies and his mental limitations as mentioned above within the hypothetical. These limitations, in addition to Derrig's lifting limitation, led the vocational expert to conclude that Derrig could return to his work as a materials handler. The court finds that the ALJ included Derrig's limitations that were supported by credible evidence in the record, and consequently, the ALJ's hypothetical fully described Derrig's limitations. With these limitations, Derrig could not meet his burden of showing he could not return to his past relevant work. Therefore, the Secretary had no obligation to demonstrate that Derrig retained the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and work experience. Yet the ALJ went through this analysis with the vocational expert who found there were several assem-

bly/factory activity positions that Derrig could perform, even with the additional limitations of only a fair ability to deal with work stress, a fair ability to relate to co-workers and supervisors, and a fair ability to maintain attention and concentration. (Tr. 121–22.). Although the vocational expert stated he wasn't sure of the availability of these positions if all three of these additional limitations were present, he asserted that individually, each additional limitation would not affect the ability of Derrig to perform this type of job. However, this analysis is irrelevant, considering that the court is persuaded by the accuracy and appropriateness of the ALJ's hypothetical and his subsequent conclusion that Derrig can return to his past relevant work as a materials handler. Therefore, because S.S.R. 85–15 only applies to claimants who meet their burden of showing they cannot return to their past relevant work, S.S.R. 85–15 does not apply to Derrig.

### 4. Disability under POMS

■ Derrig further argues that the ALJ should have considered the definition in the Social Security Administration's Programs Operation Manual System ("POMS") to classify Derrig as disabled and thus entitled to benefits. POMS DI24515.056D(1)(C) provides that "slightly higher I.Q.'s (e.g. 70–75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence of determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found." Social Security Administration Program Operating Manual Systems DI24515.056D(1)(C).

■ The POMS is a policy and procedural manual issued to help clarify the regulations for the Social Security Administration field offices. This publication is merely a guideline for internal use within the Social Security Administration and does not carry the force of law. *Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam) (concluding that claims manual rules promulgated for claims representatives do not bind the Social Security Administration); *Greenspan v. Shalala*, 38 F.3d 232, 239 (5th Cir.1994) (POMS manual is not binding because it is an unpublished policy statement; however, the court will do a case-by-case inquiry to consider the proper circumstantial evidence of disability); *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir.1991); *Parker v. Sullivan*, 891 F.2d 185, 190 (7th Cir.1989) (recognizing that the POMS manual has no legal force and does not bind the Secretary); *Bonner v. Chater*, 54 F.3d 779 (7th Cir.1995); *Woods v. Shalala*, 884 F.Supp. 156, 159 (D.N.J.1995). *But see Davis v. Secretary of Health and Human Servs.*, 867 F.2d 336, 339–40 (6th Cir.1989) (although POMS does not have the force and effect of law, it is nevertheless a persuasive interpretation by the Secretary of binding statutory and regulatory law which can be used to explain the meaning of terms within the Social Security Act). Because the POMS have no legal force, the ALJ is not bound to consider the POMS policies in Derrig's decision. Furthermore, even if the ALJ did consider this POMS section in Derrig's case, Derrig's WAIS–R examination in 1992 revealed that, although his verbal I.Q. score was only 74, his full-scale I.Q. score was 79. (Tr. 360.). In addition, although Derrig does in fact have a documented allergy to petroleum distillates, the vocational expert did not find that this allergy precluded Derrig from returning to his past relevant work, nor would it preclude him from obtaining other jobs available in significant numbers in the national economy. Also, although Derrig has been diagnosed with adjustment disorder with mixed emotional features, there is substantial evidence in the record as a whole that this mental impairment would not preclude him from performing his past relevant work or other work available in the national economy. Consequently, because Derrig's impairments do not have an effect on Derrig's ability to perform his past relevant work or other work available in the national economy, Derrig's impairments do not impose "additional and significant work-related limitations of function" to render him disabled within the meaning of the POMS section. Therefore, despite the fact that the ALJ did not rely on the POMS section in question,

**604**

there is substantial evidence to support the ALJ's finding that Derrig is not disabled.

### III. CONCLUSION

Based on its review of the record and the ALJ's decision, the court is persuaded the objective medical evidence regarding Derrig's physical and mental impairments supports a finding that Derrig did not develop a disabling condition after February 28, 1989, entitling him to benefits within the Social Security Act. Furthermore, the court concludes the ALJ's credibility determinations regarding Derrig's subjective pain complaints are supported by substantial evidence as a whole. The ALJ recognized the inconsistencies in the record between Derrig's impairments and his subjective pain complaints. These inconsistencies, coupled with the lack of objective medical evidence in the record, constituted substantial evidence of a lack of disability concerning Derrig's physical and mental impairments. In addition, the ALJ's hypothetical fully described Derrig's impairments and revealed that Derrig could return to his past relevant work as a materials handler. This hypothetical and subsequent conclusion constituted substantial evidence of a finding of no disability. Additionally, POMS DI24515.056D(1)(c) is not binding on the Secretary. Even upon consideration of this POMS section, Derrig does not fit the description outlined in the section to render him disabled and entitled to benefits. For these reasons, the court concludes there is substantial evidence in the record as a whole to support the ALJ's denial of benefits. Therefore, judgment shall be entered affirming the ALJ's decision.

**IT IS SO ORDERED.**